AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)   ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

FILED
CLERK, U.S. DISTRICT COURT
9/12/2022
CENTRAL DISTRICT OF CALIFORNIA
BY: Valeria Munoz DEPUTY

LODGED
CLERK, U.S. DISTRICT COURT
9/12/2022
CENTRAL DISTRICT OF CALIFORNIA
BY: VAV DEPUTY

United States of America

v.

HECTOR VALENCIA,

Defendant.

Case No.   2:22-mj-03610-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of September 11, 2022, in the county of Los Angeles, in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 841(a)(1) | Possession With Intent to Distribute a Controlled Substance |

This criminal complaint is based on these facts:

   *Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ Eric Hasaka
Complainant's signature

DEA Task Force Officer Eric Hasaka
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: 9/12/2022

Judge's signature

City and state: Los Angeles, California

Hon. Charles Eick, U.S. Magistrate Judge
Printed name and title

AUSA: Kathrynne Seiden (x0631)

**AFFIDAVIT**

I, Eric Hakala, being duly sworn, declare and state as follows:

## I.  PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint against Hector Valencia ("VALENCIA") for a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance.

2. This affidavit is also made in support of an application for a warrant to search the following digital device in the custody of DEA, in Los Angeles, California, as described more fully in Attachment A: one Black Samsung, Galaxy S8, with a telephone number of (661) 731-2260, bearing serial number R38J70CKVXJ and IMEI number 355986084890871 (the "SUBJECT DEVICE").

3. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances) (the "SUBJECT OFFENSES"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrant and does not purport to set forth all of my

knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. **BACKGROUND OF AFFIANT**

5. I am a peace officer for the Los Angeles County Sheriff's Department ("LASD") and have been so employed since 1991. I am currently assigned to the LASD Narcotics Bureau as a narcotics investigator. During my tenure at the LASD Narcotics Bureau, I have worked on several Task Forces for the Drug Enforcement Administration ("DEA"). I am currently assigned as a Task Force Officer with the DEA at Los Angeles International Airport ("LAX").

6. In addition to the formal narcotics training I received in the LASD Academy, I have completed a forty-hour criminal investigations course. I hold an Advanced Peace Officer Standard of Training certificate and have attended several seminars in the field of criminal investigation and narcotics and substance abuse.

7. Throughout my career, I have conducted and participated in hundreds of investigations into the unlawful importation, possession with intent to distribute, and distribution of controlled substances (including cocaine, methamphetamine, phencyclidine, and heroin) as well as U.S. currency. In conducting these investigations, I have utilized a variety of investigative techniques and resources, including physical and electronic surveillance and various types of

2

informants and cooperating sources. Through these investigations, my training and experience, and conversations with other agents and law enforcement personnel, I am familiar with the methods used by narcotics traffickers to smuggle and safeguard narcotics and U.S. currency, to distribute narcotics, and to collect and launder related narcotics proceeds.

### III. SUMMARY OF PROBABLE CAUSE

8. On September 11, 2022, law enforcement found three suspicious vacuum-sealed packages wrapped in clothing in VALENCIA's carry-on suitcase. One of the packages contained a brick-shaped block weighing one kilogram, which field tested presumptively positive for cocaine. The other two packages contained cylindrical shaped packages, weighing approximately 2.5 kilograms in total, which contained blue/green pills. In a Mirandized interview, VALENCIA stated that he expected to be paid $5,000 to transport what he believed was marijuana to an unknown person in Iowa.

### III. STATEMENT OF PROBABLE CAUSE

9. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A. TSA Discovers Suspected Drugs in VALENCIA's Carry-On Suitcase**

10. On September 11, 2022, at approximately 6:40 a.m., Transportation Security Administration ("TSA") officials conducting passenger screening at the Tom Bradley International Terminal at LAX flagged for further inspection a carry-on

suitcase placed on the conveyer belt by VALENCIA.  TSA officials reported that, at a secondary screening, they opened the suitcase and observed items wrapped in clothing.  TSA officials reported that they removed the items and noticed plastic packages containing loose blue/green pills.

11. At TSA's request, Los Angeles World Airport Police ("LAWA") Officers Lozano, Komiyama, and Fernandez responded to the scene and notified DEA.  Officers Komiyama and Fernandez detained VALENCIA and transported him to the DEA office within LAX.

12. At the DEA office, Group Supervisor Randall Davis and DEA Special Agent Ashish Pandya opened the suitcase and reported that they observed three large, clear vacuum-sealed packages. One of the packages contained two cylindrical shaped packages and a few scattered loose blue/green pills.  The second package contained another two cylindrical shaped packages.  The third package contained a brick shaped block.  The suitcase also contained men's T-shirts and a pair of shorts.

**B.   VALENCIA Admits to Possessing the Suitcase and Knowing it Contained a Controlled Substance**

13. I interviewed VALENICA at the DEA office within LAX. I informed VALENCIA of his Miranda rights, which he verbally waived.  VALENCIA also signed a written Miranda waiver form.

14. During an interview, VALENCIA initially said he had no idea what was inside his suitcase.  VALENCIA stated that his friend, Marcos Ontiveros ("Ontiveros") asked VALENCIA whether he wanted to make some money and said he would connect VALENCIA

4

with someone else. VALENCIA said that approximately two days ago, another person, also named Marcos ("Marcos"), contacted him. VALENCIA said that Marcos told him to have about two days' worth of clothing ready and that Marcos would pick him up at his house around 3:00 a.m on Sunday, September 11, 2022. VALENCIA said that on September 11, 2022, Marcos came to his house and asked him for his clothing. VALENCIA said that Marcos then took his clothing and went to the trunk of his car, where he placed the clothing inside a suitcase. Marcos then drove VALENCIA to LAX, where he handed VALENCIA the suitcase.

15. VALENCIA initially denied knowing how much he would be paid for taking the suitcase to Arizona. Later in the conversation, VALENCIA said that Ontiveros has been a courier for Marcos for the past eight months and gets paid $5,000.00 a trip; that Ontiveros told VALENCIA he would be paid $5,000; and that Ontiveros told VALENCIA he would be transporting marijuana. VALENCIA also admitted that he was supposed to deliver the suitcase to Iowa, get paid for the delivery, and then come home. VALENCIA was supposed to call Marcos when he arrived for further instruction and did not know where or to whom he would be delivering the suitcase.

16. VALENCIA provided me with the SUBJECT DEVICE and told me that it was his cell phone.

17. I confirmed from Airline records that VALENCIA was scheduled to fly on a one-way flight from LAX to Des Moines, Iowa, with a layover in Phoenix, Arizona. The itinerary did not include a return flight.

### C. One Package Tests Presumptively Positive for Cocaine

18. The brick-shaped package from VALENCIA's suitcase contained approximately 1 kilogram of a white powdery substance. Special Agent Pandya field tested the substance, which tested presumptively positive for cocaine.

19. The cylindrical packages from VALENCIA's suitcase weighed approximately 2.5 kilograms in total and contained blue/green pills. Special Agent Pandya field tested the pills, which yielded an inconclusive result. Based on my training and experience, I believe these pills likely contain fentanyl.

### IV. TRAINING AND EXPERIENCE ON DRUG OFFENSES

20. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

    a. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

    b. Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs. The aforementioned records are often maintained

where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

   c.   Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

   d.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

## V.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES

21.  As used herein, the term "digital device" includes the SUBJECT DEVICE.

22.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

7

a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and

8

who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

        d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

    23.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

        a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

        b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

24. If it requires biometric unlock, the search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

    a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

    b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

    c. The person who is in possession of a device or has the device among his or her belongings is likely a user of the device. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to the SUBJECT

DEVICE: (1) depress VALENCIA's thumb- and/or fingers on the device; and (2) hold the device in front of VALENCIA's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

25. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VI. CONCLUSION

26. For all of the reasons described above, there is probable cause to believe that VALENCIA has committed a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance. There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICE described in Attachment A.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 12th day of
September, 2022.

_____
THE HONORABLE CHARLES EICK
UNITED STATES MAGISTRATE JUDGE